### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00197 (DLF)** |
| **v.** | : | |
| | : | |
| **JACKSON KOSTOLSKY,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Jackson Kostolsky to 30 days of incarceration and $500 in restitution.

### I.    Introduction

Jackson Kostolsky participated in the January 6, 2021 attack on the United States Capitol— a violent attack that forced an interruption of the Congressional certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers and resulted in more than one million dollars of property damage.

Kostolsky pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, and Picketing in a Capitol Building. Although inside the Capitol for approximately 10-13 seconds, a term of incarceration is appropriate for Kostolsky because (1) he scaled the wall to get to the Upper West Terrace after he saw others doing the same; (2) he was tear gassed but texted friends that nonetheless they "just kept advancing"; (3) he entered the Capitol through the Parliamentarian doors breached by rioters *only 30 seconds earlier*; and (4) despite hearing an alarm blaring inside, he left only when the Capitol police yelled "get out"; (5) Kostolsky proudly texted

1

friends that he scaled the wall, got tear gassed, "caught a rubber bullet", went inside the Capitol and saw windows being broken. In addition, he told one person "I had fun" and the politicians were "crawling in fear"; (6) he first denied entering the Capitol when talking to the FBI, then later admitted he did go in; and (7) he deleted videos from his telephone.

The Court must also consider that Kostolsky's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement officers, breach the Capitol building, and disrupt for several hours the Electoral College certification proceedings. But for his actions alongside so many others, the riot likely would have failed. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Kostolsky's participation in a riot that actually succeeded in halting the Congressional certification combined with Kostolsly's manner of entry, despite tear gas and alarms blaring, bragging and endorsing the events on that day, and destruction of evidence militates a sentence of incarceration.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 30 (Statement of Offense) at 1-3. As this Court knows, a riot cannot occur without rioters, and each rioter's actions contributed, directly and indirectly, to the violence and destruction of that day.

*Jackson Kostolsky's Role in the January 6, 2021 Attack on the Capitol*

The defendant, Jackson Kostolsky, traveled with friends from Allentown, Pennsylvania to Washington, D.C. to support former President Trump on January 6, 2021. As he texted a friend on January 4th:



**Unknown**

Meet me in DC babe. Im catching a ride with my boys to see King Trump on Wednesday

1/4/2021 11:13:25 PM(UTC+0)

His attire was distinctive – he wore a leopard print vest and red sneakers:



He went to the Capitol, and upon walking up to the building, the scene pictured below in a photograph obtained from the telephone of another defendant shows what Kostolsky would have seen - a large crowd with smoke or other substances in the air:



Once at the Capitol, Kostolsky took pictures outside including ones of people scaling the walls:



Kostolsky himself then scaled the wall to get to the upper west terrace of the Capitol, amid

rioters wielding bicycle racks. This is portrayed below as captured by the New York Times:





Kostolsky arrived on the upper west terrace moments later and took a video. (See Gov't Exh. A). His arrival was at or around the time the Senate Wing Doors (depicted by the arches) were breached for the first time. It was also right before the Parliamentarian Doors (depicted by the gold railing) were breached. Both doors are shown in the background of a selfie and in a screenshot from a video Kostolsky took (See Gov't Exh. B):



Kostolsky then entered the building at 2:16 p.m. only 30 seconds after the Parliamentarian Doors were breached by rioters opening them from the inside, shown below through surveillance footage:





Kostolsky entered and was inside approximately ten to 13 seconds. In the video he shot

(Gov't Exh. C), the alarm is going off and Capitol officers can be heard shouting "Get out, get

out!"



Capitol police officers were also captured on surveillance footage running towards the doors, from down the hall:



When Kostolsky heard the officers shouting "get out", he turned to leave the Capitol building as another Capitol police officer started pushing rioters outside:





*FBI Interview of Kostolsky*

Kostoloky confessed to the FBI when interviewed on or about January 19, 2021 that he

traveled from Allentown, PA to the Capitol on January 6, 2021 with friends, whom he would not

name.  When he got to the Capitol, he first said he saw a man breaking glass so he left and did not

go inside.  He stated that he got tear gassed after that.  Later in the interview Kostolsky recanted and admitted he did in fact go inside the Capitol about 5 feet, but then was forced out by "riot police", and that a riot squad were pushing people out of the building.  He also said that he saw the man breaking the window after he left the building.  Kostolsky admitted he took video inside the Capitol but deleted that video from his telephone.

Three videos were recovered once the telephone was searched after his arrest, pursuant to legal process. On the data on his telephone, he texted friends admitting he went inside despite tear gas being deployed by the police to keep people out of the building and the grounds and seeing people breaking glass on the building. He claimed in the texts to have suffered the effects of the tear gas personally and been bruised by a rubber bullet.

*Texts Sent January 6th and After the Riot*

Kostolsky texted (in green) on January 6th that he had been tear gassed, hit by a rubber bullet, and that the politicians were "crawling in fear", and that he had scaled the wall and gone inside:



Rather than being deterred by being tear gassed, Kostolsky doubled down:



Despite the clear evidence that he should not be there, Kostolsky bragged and replied to someone who asked if he had "stormed the capitol:



When his friend texted back what he did looked bad, Kostolsky showed no remorse, but doubled down and replied "I had fun ":



Tellingly, Kostolsky knew he was in legal trouble not just because of his statement to the FBI about deleting the video he took but also by the below text he sent the day after the riot:



*The Charges and Plea Agreement*

On January 11, 2021, Kostolsky was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). On February 26, 2021, he was arrested in Pennsylvania. On March 9, 2021, a four-count Information against Kostolsky was filed, alleging four counts of 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(G). On September 28, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing

in a Capitol Building. By plea agreement, Kostolsky agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Kostolsky now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Kostolsky faces up to six months of imprisonment and a fine of up to $5,000. Kostolsky must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below the Section 3553(a) the factors weigh in favor of a term of incarceration..

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should consider that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Kostolsky specifically heard a blaring fire alarm after he entered. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials, and smelled chemical irritants in the air, or was tear gassed and shot with a rubber bullet, as Kostolsky texted friends. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Kostolsky took pictures of the crowds outside the Capitol on January 6, 2021 and texted some to friends, stating he had been tear gassed, that he climbed a wall, and had gone inside. Despite the tear gas and the chaos, he chose to enter Capitol only *30 seconds* after the Parliamentarian Doors had been breached, after scaling the wall amidst rioters brandishing bicycle racks as weapons.  Inside he heard a fire alarm blaring, and while videoing inside, he saw officers running down the hallway shouting to get out. He told the FBI that riot police pushed him out. Kostolsky texted his photographs to his friends taken outside the Capitol as well as the New York Times photograph of him climbing up the wall. He bragged that no one could climb like he did and that he got tear gassed and received a bruise from a rubber bullet. Kostolsky left the building after approximately 10 to 13 seconds, but only because the Capitol police were yelling to get out as they ran after the rioters.  It is also shocking that the blaring alarms, the smell of chemical irritants including tear gas, the breaking of windows, the use of bicycle racks as weapons, and the dispersal of law enforcement were not sufficient signs of the danger that lay ahead.

Accordingly, the nature and the circumstances of this offense establish the need for incarceration as a restraint on Kostolsky's liberty as a consequence for his actions in this matter.

### B.  The History and Characteristics of Kostolsky

Kostolsky has no criminal history other than citations. ECF 39 PSR, ¶¶ 23-27. He is a high school graduate who is a part-time dog walker that lives with his mother. Id. at ¶¶ 37, 48, 51. He has been compliant with his conditions of pre-trial release. *Id*. at ¶ 8.  This factor favors Kostolsky.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

16

democratic process."[1] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was intended by many to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[1] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id*. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). This Court should convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have adverse consequences. There is possibly no greater factor that this Court must consider. This country will be forever stained by that day.

*Specific Deterrence*

Kostolsky went inside the Capitol despite getting tear gassed, "catching a rubber bullet" (as he texted) and seeing officers in riot gear and rioters with bicycle racks as weapons. He heard a fire alarm in the building when he entered 30 seconds after the doors were breached, and yet stayed long enough to take video inside. He left only because police in riot gear yelled to get out and were pushing him and others outside. Kostolsky showed no remorse in his texts after the riot nor in his interview with the FBI.  In fact his only concern was to destroy and discard evidence so not to be caught. To specifically deter Kostolsky from engaging in future, riotous behavior, he should understand the consequences of his conduct, and how his individual conduct affected the country.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[2] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[3] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

---

[2] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[3] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Kostolsky has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559(a)(7). Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of their participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no

unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, this Court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences previously handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the misdemeanor Capitol breach cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police, prompt acceptance of responsibility, and expressions of genuine remorse.

A comparison with sentences imposed in other misdemeanor cases with similar facts is informative. Defendants who have witnessed violence, destroyed property or made post-January 6th postings or remarks have received sentences from probation to incarceration. However, the government is aware of at least six (6) defendants who, like Kostolsky, showed no remorse or destroyed evidence.  Incarceration was imposed in all but one case[4].

In September 2021, Derek Jancart and Erik Rau were sentenced after pleading guilty in July to Title 40, U.S.C. 5104 (e)(2)(D). Jancart came to the Capitol with a gasmask and a radio; posted a video in which Rau said "we have you surrounded"; made post January 6th statements suggesting violence; and deleted incriminating materials.  Rau brought a medical kit and gloves; videotaped his statement above; went into the Speaker's conference room; and deleted incriminating materials. The government recommended 45 days of incarceration for each, which the Court imposed. *See United States v. Jancart and Rau*, 21-CR-148-JEB.

---

[4] Incarceration was imposed in: *United States v. Bauer*, 21-CR-49-TSC (45 days); *United States v. Mazzocco,* 21-CR-54-TSC (45 days); *United States v. Jancart and Rau*, 21-CR-148-JEB (45 days each defendant); *United States v. Camper*, 21-CR-325-CKK (60 days).  The Court imposed 2 years of probation and 90 days of home confinement in *United States v. Leonard Gruppo,* 21-CR-391-BAH.

In *United States v. Mazzocco,* 21-CR-54 (TSC), the defendant received a sentence of 45 days incarceration. The defendant was inside about 12 minutes, and wore a body camera to the Capitol. He anticipated violence, took photos and selfies of unruly conduct showing people trying to get into the East Rotunda door.  He posted a selfie on Facebook with the Capitol in the background online January 6th captioned "The capitol is ours" and showed no remorse in texts, claiming there was no riot but a mere protest in which "antifa" cause violence.  By January 7, 2021 he had deleted the post in his Facebook account, and soon thereafter his entire social media presence. In addition, when asked where the body camera was by the FBI, the defendant claimed not to know where it was and search for it yielded negative results.

Robert Bauer went into the Capitol with his cousin, Edward Hemenway.  Both received sentences of 45 days incarceration although the government recommendation was for 30 days incarceration. *See United States v. Bauer and Hemenway*, 21-CR-49 (TSC).  Both men have serious criminal histories, which Kostolsky does not have. However, both men posted in a selfie together with their middle finger raised while inside a mob in the Capitol.  Both were inside about 17 minutes, including being inside the Crypt while officers were being attacked. Bauer expressed no remorse when he spoke with the FBI, stating he did not feel he did anything "terribly wrong." Hemenway however did feel badly about his actions and admitted he had seen a Do Not Enter sign and S.W.A.T. team members near the scaffolding where he entered the building.

Lastly, Boyd Camper entered the Capitol after seeing confrontations with police and rioters and police using tear gas, which he too experienced. He walked in with is Go-Pro recording inside. After leaving the building but still on Capitol grounds he told the media "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready." When interviewed by the FBI on January 21st, Camper admitted he had the Go-Pro audio and video

but refused to provide the contents ~~it~~ to law enforcement, and a couple months later, he told the FBI that Go-Pro was "buried out in the cold" and would not reveal its location. *United States v. Camper*, 21-CR-325 (CKK). Mr. Camper was sentenced to 60 days incarceration.

In the case in which probation and home detention was imposed the government had recommended 30 days incarceration.  *United States v. Leonard Gruppo,* 21-CR-391(BAH), The defendant was a 28 year army veteran who entered for a short time (6 minutes) and who ignored the commands of law enforcement.  Like Kostolsky, he destroyed his photos/videos, scaled a small wall on the way into the Capitol, and did not have social media. Gruppo received a sentence of 24 months' probation, 90 days of home detention, a $3,000 fine, $500 restitution, and a location monitoring condition.

There were cases in which no destruction of evidence was involved, but the defendant climbed a wall, like Kostolsky.  In *United States v. Jordan* Stotts, 21-CR-272 (TJK) the Court imposed a sentence of 24 months probation, two months home detention, $500 restitution, and 60 hours of community service. Stotts, like Kostolsky, had climbed the wall to get up to the upper area:



Stotts however stayed inside much longer and resisted law enforcement efforts to clear out rioters inside the Rotunda, standing in the front before the Capitol police line. However the destruction of evidence and lack of remorse indicate that a more restrictive sentence be imposed for Kostolsky.

In summary, when analyzing the various cases, 30 days of incarceration for Kostolsky is a sentence sufficient but not greater than necessary to meet the objectives of Title 18, U.S.C. §3553(a) Kostolsky did not take a body camera, medical kit, masks or other gear anticipating violence. He was inside a much shorter time than the other defendants discussed above, which factors in his favor.  Thus, a sentence of 30 days incarceration is not a disparate sentence to those imposed in the other cases.  Id. at subsection (a)(6).

The goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir.

2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently— differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." Id. at 1095.

**Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Jackson Kostolsky to 30 days of incarceration, a fine of $500 and $500 in restitution.  Such a sentence is sufficient but not greater than necessary and protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481 052

By:    */s/ Mona Lee M. Furst*
MONA LEE M. FURST
Assistant United States Attorney
Federal Major Crimes
Detailee
U.S. Attorney's Office
301 N. Main, Ste 1200
Wichita, Kansas 67202
Office: 316-269-6481
Mona.Furst@usdoj.gov

</div>