**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Cr. No. 21-197 (DLF)** |
| | ) | |
| **JACKSON KOSTOLSKY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

<u>**SENTENCING MEMORANDUM**</u>

Mr. Jackson Kostolsky, through undersigned counsel, respectfully submits this memorandum requesting that this Court consider his entire life in determining a fair and just sentence.

<u>**BACKGROUND**</u>

On December 19, 2020, following his loss in the 2020 presidential election, then-President Donald Trump announced a "Save America" rally to protest the results.[1]  The rally was set for January 6, 2021, the same date Congress was set to certify Joe Biden as the winner.  On the morning of January 6, 2021, attendees gathered at the Ellipse in anticipation of the rally's start.[2]  A number of speakers took to the stage, including some high-profile figures in the Republican Party.  Representative Mo Brooks (R-Ala.) urged "American patriots" to "start

---

[1]     President Trump announced the rally on Twitter, tweeting, "Big protest in D.C. on January 6th . . . Be there, will be wild!"  *See* Dan Barry and Sheera Frenkel, *'Be There. Will Be Wild!': Trump All but Circled the Date,* The New York Times (Jan. 6, 2021), available at https://www.nytimes.com/2021/01/06/us/politics/capitol-mob-trump-supporters.html.

[2]     Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

taking down names and kicking ass."[3]  Katrina Pierson, President Trump's spokesperson during his 2016 campaign, stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or we will go after them."[4]  Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican lawmakers to challenge the election result and "punch back from Donald Trump."[5]  Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees to march on the Capitol to "stand up for this country and stand up for what's right."[6]  Donald Trump, Jr. narrated that "You have an opportunity today: You can be a hero, or you can be a zero. And the choice is yours but we are all watching."[7]  Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "trial by combat."[8]

Finally, around noon, President Trump took to the stage.  For an hour, he bemoaned the election results, imploring attendees to "fight" for him:

> We will not let them silence your voices. . . we're going to walk down to the Capitol, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen. . . And we fight. We fight like hell. And if you don't fight like hell, you're not going to have a country anymore. . . So we're going to, we're going to walk

---

[3]    *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachment-stop-the-steal-speakers-467554.

[4]    *Id.*

[5]    *Id.*

[6]    *Id.*

[7]    *Id.*

[8]    *Id.*

down Pennsylvania Avenue. I love Pennsylvania Avenue. And we're going to the Capitol, and we're going to try and give.[9]

At approximately 12:30 p.m., even before President Trump concluded his speech, some of the rally attendees migrated from the Ellipse toward the Capitol.[10]  At approximately 12:50 p.m., those same attendees breached the outer barricades of the U.S. Capitol grounds.[11]  The U.S. Capitol Police officers, who had been stationed behind the barricades, retreated and called for backup from the Metropolitan Police Department (MPD) and National Guard.[12]  The MPD arrived approximately 15 minutes later, mobilizing and moving from the South of the building to the West.  But the National Guard did not respond for nearly four hours, during which time clashes between the first wave of protestors and police intensified.[13]

When President Trump concluded his remarks around 1:00 p.m., a second wave of protestors left the Ellipse and headed toward the Capitol.  By the time they arrived, the outer barriers and fencing that had previously surrounded the Capitol grounds were largely displaced, giving them free access to join the first wave of protestors on the steps of the building.  Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol itself was breached through a broken window adjacent to the Senate Wing Doors, located on the

---

[9]     *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[10]    *See* Dmitiy Khavin, et al., *Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol*, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html; *see also* Shelly Tan, et al., *How one of America's ugliest days unraveled inside and outside the Capitol*, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

[11]    *Id*.

[12]    *Id*.

[13]    *Id*.

Northwest side of the building.  This breach spurred the evacuation of members of Congress and the Vice President, who at the time, were debating congressional challenges to the Electoral College results.[14]

Following the building's breach, Mr. Kostolsky entered the door entryway at the Upper West Terrace at approximately 2:16 p.m.  *See* PSR ¶ 16, pg. 6.  For approximately **ten seconds**, Mr. Kostolsky was inside the building.  *Id (*Emphasis added*)*.  As soon as officers shouted to get out, Mr. Kostolsky immediately exited the building.

On January 18, 2021, Mr. Kostolsky met with the F.B.I. and admitted to being inside the U.S. Capitol on January 6, 2021.  *See* Statement of Facts, ECF #1-1, pg. 2.

On February 23, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Kostolsky with four misdemeanor offenses.  *See* ECF # 1.  On February 26, 2021, Mr. Kostolsky was arrested in the Eastern District of Pennsylvania.  *See* ECF #5.  He was released the same day of his arrest and ordered to appear before Magistrate Judge Zia M. Faruqui on March 4, 2021.  *See* PSR ¶ 7, pgs. 5-6. On March 4, 2021, he appeared as directed and was ordered released.  *See* PSR ¶ 8, pg. 5.

On March 9, 2021, an Information was filed charging him with Count One, Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); Count Two, Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); Count Three, Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and Count Four, Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  *See* ECF # 10.  At a status

---

[14]    *Id.*

hearing held on July 28, 2021, the defense submitted that it had received a plea offer a few days prior to the hearing and needed time to review it, along with discovery in the case. A request for a plea/status hearing was scheduled for September 28, 2021.

On September 28, 2021, this Court accepted Mr. Kostolsky's guilty plea to Count Four of the Information, and scheduled his sentencing for December 21, 2021. *See* Minute Entry, 9/28/21; and ECF #28-30. On December 13, 2021, the defense filed an unopposed motion to continue the sentencing hearing because of Mr. Kostolsky's health. *See* ECF #38. This Court granted the continuance and rescheduled his sentencing hearing to January 11, 2022. *See* Minute Order, 12/14/21.

## ARGUMENT

Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), is a class B misdemeanor or "petty offense," as defined by 18 U.S.C. § 3559(a)(7), because it carries a maximum incarceration period of six months or less. The United States Sentencing Guidelines (Guidelines) do not apply to class B misdemeanors. *See* U.S.S.G. §1B1.9. Additionally, pursuant to 18 U.S.C. § 3583(b)(3), the Court is disallowed from imposing a term of supervised release for a petty offense, and if it imposes active, continuous imprisonment, 18 U.S.C. § 3551 seemingly does not support an additional period of probation to follow. *See United States v. Torrens et. al.*, Crim. No. 21-cr-204 (BAH), ECF No. 110, 113, & 125.

Because the Guidelines do not apply, the Court is directed to look to 18 U.S.C. § 3553(a) to impose a sentence that is "sufficient, but not greater than necessary, to comply with the purposes [of sentencing]." The factors enumerated in 18 U.S.C. § 3553(a)(1) include "the nature and circumstances of the offense and the history and characteristics of the defendant."

5

Additionally, the Court should determine the "need" for the sentence, by considering if and how a term of incarceration would "reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense." *Id*. at (2)(A). Moreover, the Court should consider how a sentence would "afford adequate deterrence to criminal conduct," "protect the public from further crimes of the defendant," and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id*. at 2(B-D). Further still, the Court must be mindful of "the kinds of sentences available," should consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," and should consider the "need to provide restitution to any victims of the offense." *Id*. at (3), (6), & (7).

## I.   Nature and Circumstances of Mr. Kostolsky's Offense

The events of January 6 cannot, and should not, be minimized. When protestors unlawfully assembled on the grounds of the U.S. Capitol Building, and later broke through windows and doors, over 100 law-enforcement officers were injured and the U.S. Capitol Building sustained $1.4 million in property damage. Five individuals lost their lives.[15] And because of the breach, the 2020 Presidential Electoral College count was delayed. All of these casualties and disruptions exacted a toll on Americans: some lost family members, some lost friends, and some lost confidence in the American political system's ability to defend against threats to the peaceful transfer of power.

However, Mr. Kostolsky was not the cause of January 6, nor was he in the classification

---

[15]     Ashli Babbitt was killed after she refused to comply with police commands. Kevin Greeson and Benjamin Philips died of unrelated, but perhaps exacerbated, medical conditions while in the crowd. Rosanne Boyland was crushed to death. Officer Brian Sicknick died the day after, from injuries that appear related to his service on January 6. *See* Jack Healy, *These Are the 5 People Who Died in the Capitol Riot*, The New York Times (Jan. 11, 2021), available at https://www.nytimes.com/2021/01/11/us/who-died-in-capitol-building-attack.html.

of people that caused physical harm to the Capitol or others.  He entered the building, but his unlawful entrance cannot, and should not, be conflated with the many other, wider, failures that occurred that day.  Additionally, the former president, the rally's organizers and speakers, and nefarious, organized groups contributed to the chaos.  The American system of justice, and specifically 18 U.S.C. § 3553(a), directs the Court to look at every defendant and every defendant's actions individually.  *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007); *Gall v. United States*, 552 U.S. 38 (2007).

On January 6, Mr. Kostolsky, upon the urging of President Trump, traveled to Washington, D.C., to protest the results of the 2020 presidential election.  He rode to the nation's capital from Allentown, Pennsylvania.  After hearing the president's speech and heeding his call for supporters to "walk down Pennsylvania Avenue," Mr. Kostolsky marched with thousands of others to the Capitol building.  By the time he arrived, many of the outer barricades and bicycle racks used by officers to cordon off the Capitol grounds were displaced.  At approximately 2:16 p.m., Mr. Kostolsky walked through a previously breached door of the Capitol and stood there for approximately ten seconds before he exited.

To be clear, Mr. Kostolsky played no role in organizing the January 6 rally, nor did he deliver inciting and aggressive commentary to the already energized crowd.  He urged no one to "kick[] ass," "go after [politicians]", "punch back from Donald Trump" or engage in "trial by combat."  Additionally, Mr. Kostolsky did not participate in the forceful breaching of the outer barricades, nor did he participate in the breaching of the inner doors or windows of the U.S. Capitol.  He did not damage or steal any property while inside.  He, at no time, assaulted or threatened law enforcement.  Instead, Mr. Kostolsky's offense conduct that day consisted of him unlawfully assembling at the U.S. Capitol, walking through an already breached door, and

7

remaining there for 10 seconds.

## II.     Mr. Kostolsky's History and Characteristics

Born and raised in Allentown, Pennsylvania, Mr. Kostolsky is 32 years old.  He shares a

very close relationship with his parents, as he is their only child together.  Despite his parent's

divorce at the age of twelve, Mr. Kostolsky was raised by both parents who supported all of his

academics and involvement in sports as a child.  Throughout the years, Mr. Kostolsky has

resided with each of his parents at their respective homes.  For the past three years, Mr.

Kostolsky has lived with his mother.  *See* PSR ¶ 37, pg. 9.

Mr. Kostolsky graduated high school and attended community college for a brief period

thereafter.  *See* PSR ¶ 48-49, pg. 11.  Since his graduation from high school, Mr. Kostolsky has

been employed in a variety of positions involving landscaping, driving, and warehouse positions.

*See* PSR ¶ 52-53, pg. 12.  For the past three years, Mr. Kostolsky has been employed as a pet

caretaker/dog walker.  See PSR ¶ 51, pg. 12.   He loves the job and has aspirations of developing

his skill set into training pets.  As evidenced by the attached letters in support of Mr. Kostolsky,

he is a trustworthy and peaceful person who loves animals and his family.  *See* Exhibit, letters in

support.

In addition to the letters of support from his family and friends, Mr. Kostolsky also

submits a letter to this Court in an effort to explain his involvement on January 6, 2021, and his

unlawful entrance to the U.S. Capitol building.  *See* Exhibit, Letter Written by Mr. Kostolsky.

He is very ashamed of his behavior and very remorseful for his conduct.  He accepts full

responsibility for his actions and is prepared for the consequences of his actions.  *Id.*

## III.     A Sentence of Probation Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Kostolsky to probation would not contribute to an unwarranted

sentencing disparity, but sentencing him to *anything other* than probation, might.  Though many of the January 6 cases are unresolved, the Court can look to other sentencing judgments to gain a baseline.  January 6 defendants in other cases who pled to the *exact* same criminal charge have received probationary sentences.  *See United States v. Anna Morgan-Lloyd*, Crim. No. 21-164 (RCL)(36 months probation); *United States v. Valerie Ehrke*, Crim. No. 21-097 (PLF)(36 months probation); *United States v. Danielle Doyle*, Crim. No. 21-324 (TNM)(2 months' probation); *United States v. Eliel Rosa*, Crim. No. 21-068 (TNM)(12 months probation); *United States v. Vinson, et al.*, Crim. No. 21-355 (RBW) (5 years probation); *United States v. Thomas Gallagher*, Crim. No. 21-041 (CJN)(2 years probation); *United States v. Jacob Hiles*, Crim. No. 21-155 (ABJ)(2 years probation); *United States v. Jonathan Sanders*, Crim. No. 21-384 (CJN)(3 years probation); *United States v. Sean Cordon*, Crim. No. 21-269 (TNM) (2 months probation); *United States v. John Wilkerson, IV*, Crim. No. 21-302 (CRC)(3 years probation); *United States v. Andrew Wigley*, Crim. No. 21-042 (ABJ)(18 months probation); *United States v. Jennifer Parks*, Crim. No. 21-363 (CJN)(24 months probation); *United States v. Douglas Sweet*, Crim. No. 21-041(CJN)(3 years' probation); and *United States v. Brandon Nelson and Abram Markofski*, Crim. No. 21-344 (JDB)(2 years probation).[16]  Therefore, to sentence Mr. Kostolsky differently than the above-mentioned January 6 defendants who pled to the same offense, would *lead to* an unwarranted sentencing disparity, in stark contrast to the factors dictated in 18 U.S.C. § 3553(a)(6).

Notably, this Court in *United States v. Douglas Wangler and Bruce Harrison*, Crim. No.

---

[16]   All of these cases are contained in the chart attached to the government's sentencing memorandum.  See ECF #41-1, pgs. 1-6.

21-365 (DLF) sentenced both defendants to a two year term of probation.[17]  Interestingly, and importantly, both of those defendants were made plea offers that included the government's agreement to allocute for a sentence of probation.  *See* ECF #32 & #33, Crim. No. 21-365 (DLF).  Unfortunately, Mr. Kostolsky's plea does not have the same allocution agreement; however, the facts of Mr. Kostolsky's case are extremely similar to the facts and circumstances of Mr. Wangler and Mr. Harrison.  In the government's sentencing memo in Crim. No. 21-365 (DLF) it states that "the government issued a total of five plea offers in misdemeanor cases that included an agreement to recommend probation" and that Mr. Wangler and Mr. Harrison are "two of those five rare cases."  *See* Gov't Sentencing Memo, Crim. No. 21-365 (DLF), ECF #48 & #49.  The government's agreement to allocute for probation appears to be what is 'rare' rather than the facts of the case or the actions of the defendants.  As stated in the government's sentencing memorandum, Mr. Wangler and Mr. Harrison were inside the U.S. Capitol for 20 minutes; they each took videos/photos of themselves inside the U.S. Capitol; they each met with the F.B.I. and admitted to their conduct; and they admitted to deleting videos/photos from their phones.  *Id.* at pgs. 3-7.  Contrastly, Mr. Kostolsky was inside the U.S. Capitol for about 10 seconds; took a video/photo of inside the U.S. Capitol; met with the F.B.I. and admitted his conduct; and admitted to deleting videos/photos from his phone.  Further, the resolution timeline for Mr. Kostolsky's case is very similar to the timeline for the resolution of Crim. No. 21-365 (DLF).

Therefore, Mr. Kostolsky respectfully notes that while every case is different, a sentence of probation is appropriate.  Mr. Kostolsky respectfully submits that a sentence of incarceration would serve no purpose other than excessive punishment during a pandemic, as the research

---

[17]     This Court imposed its probationary sentence on December 16, 2021, which was two days after the government's sentencing memorandum filed in this case.

suggests that incarceration does little to change a person's behavior.  See

https://s3.amazonaws.com/static.nicic.gov/Library/032698.pdf

## **CONCLUSION**

January 6, 2021 was a horrifying day for many who watched it unfold, whether on television or in-person.  But Mr. Kostolsky, despite his presence within the crowd, was not a malicious actor who engaged in the outrageous conduct for which the day will be remembered. He did not organize or incite the riot, nor did he physically harm any person or property.  And though Mr. Kostolsky certainly deserves some punishment for his conduct, it must be weighed against his lack of criminal history, his other history and characteristics, his individual actions on January 6, the non-incarceration sentences imposed on those who engaged in similar conduct, and his ability to timely pay restitution.  Considering these and other § 3553(a) sentencing factors, a two year term of probation, restitution in the amount of $500.00, and 60 hours of community service[18] is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Dani Jahn
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

---

[18]    The probation office's recommendation is for a three year term of probation with no special conditions outside of restitution and/or a fine.  *See* ECF #40.